UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTOPHER STEFANONI,

*Plaintiff,*

v.                                                    No. 24-cv-12758-PGL

L.F.I., INC., et al.,

*Defendants.*

## <u>REPORT AND RECOMMENDATION ON MOTION<br>TO REMAND TO STATE COURT AND ON<br>PLAINTIFF'S MOTION FOR FEES</u>

LEVENSON, U.S.M.J.

For the reasons set forth below, I recommend that the Court remand this case to state

court. I further recommend that the Court allow in part Plaintiff's motion for sanctions (Docket

No. 20) and award attorneys' fees to Plaintiff pursuant to 28 U.S.C. § 1447(c) to compensate for

Plaintiff's reasonable costs in opposing the improvident removal of this case. I do not

recommend that the Court award Plaintiff any additional attorneys' fees pursuant to Federal Rule

of Civil Procedure 11.


<u>INTRODUCTION</u>

The Court lacks subject matter jurisdiction in this case, which was improperly removed

from the Massachusetts Superior Court. Although the removing defendant, Martin Lobkowicz

("Defendant" or "Removing Defendant"[1]), asserted that the case fell within this Court's diversity jurisdiction under 28 U.S.C. § 1332(a), it was evident on the face of the removal notice that one of the defendants is a dual national (a citizen of both the United States and the Czech Republic) who does not reside in the United States. Consequently, neither diversity (which involves residents of different states) nor alienage (which involves persons who are not citizens of the United States) provides a basis for jurisdiction.

After a preliminary review of the removal papers, I noted the evident lack of jurisdiction and issued an order to show cause why the matter should not be remanded. *See* Docket No. 9.

That should have made for a pretty quick remand.

It did not. And what followed does little credit to the lawyers involved.

In response to my order to show cause, Defendant argued that the Court should ignore the U.S. citizenship of the foreign resident, treating him instead as a Czech citizen. Defendant invoked the so-called "dominant nationality" theory, whereby an expatriate U.S. citizen with dual citizenship might, under exceptional circumstances, persuade a court to ignore his U.S. citizenship and thus find jurisdiction under Section 1332(a)(3). As discussed below, it is doubtful whether there is any validity to the "dominant nationality" theory as a basis for invoking diversity jurisdiction. No court has ever accepted the theory as a basis for subject matter jurisdiction, and it has been rejected at the appellate level in circuit after circuit. But even supposing that the theory had some validity, it would not plausibly apply in this case. The U.S. citizen in question only obtained his second citizenship (Czech) within the previous year, has not renounced his U.S. citizenship, and has continued to use his U.S. passport.

---

[1] Although the suit names seven defendants, only one, Martin Lobkowicz, is directly involved in the removal and the related motion practice, so I refer to him as "Defendant" or "Removing Defendant."

I heard oral argument on the jurisdictional issue. During the hearing, I noted that, under 28 U.S.C. § 1447(c), a defendant who removes a case to federal court without any legal basis may be liable for the opposing party's legal fees and costs in securing remand. I gave the parties an opportunity to brief the issue.

What followed was a flurry of filings, including a motion by Plaintiff seeking sanctions under Federal Rule of Civil Procedure 11 and extended briefing on that motion.

On the one hand, the original removal was without legal basis and was doubtless effected for the purpose of delay. Accordingly, Plaintiff is entitled to an award under the fee-shifting provisions of Section 1447(c). After deducting time that Plaintiff's counsel spent on the Rule 11 motion, and deducting for duplicative work by multiple attorneys, I find that those legal fees amount to $24,895.

On the other hand, although ample relief was available under Section 1447(c), Plaintiff launched a massive and wholly superfluous campaign seeking additional sanctions under Federal Rule of Civil Procedure 11. For this, Plaintiff asks the Court to award the astonishing sum of $92,930.67 (which includes fees spent on the remand issue).[2] Because the award of fees under Section 1447(c) is sufficient to accomplish the deterrent purposes of Rule 11, no incremental or additional award under Rule 11 is necessary or appropriate.

# I.    Removal Was Improper, and This Case Must Be Remanded for Lack of Subject Matter Jurisdiction

## A.    Removal and the Court's Order to Show Cause

On October 30, 2024, Defendant filed a Notice of Removal, removing to this Court an action that was filed two days earlier in Suffolk Superior Court. *See* Docket No. 1. The

---

[2] *See infra* note 18 for a tabulation of the total fees and costs sought.

underlying claims in the case concern alleged breaches of fiduciary duty in connection with a family legacy involving assets in the Czech Republic.

The removal was apparently designed to exploit the "snap" removal procedures embedded in 28 U.S.C. § 1441(b)(2). That statute sets forth the so-called "forum defendant" rule, under which "removal based on diversity jurisdiction is not permissible 'if any of the parties in interest properly joined and served as defendants is a citizen of the State in which [the] action is brought.'" *Rizzi v. 178 Lowell St. Operating Co., LLC*, 180 F. Supp. 3d 66, 67–68 (D. Mass. 2016) (quoting 28 U.S.C. § 1441(b)(2)). Under Section 1441(b)(2), a non-forum defendant (*i.e.*, a defendant who is not a citizen of the state where a lawsuit has been brought) can remove the suit to federal court on the basis of diversity jurisdiction, even if some named codefendants are citizens of the forum state (which would normally destroy diversity jurisdiction), *provided that* the in-state defendants have not yet been served with process. *See* 28 U.S.C. § 1441(b)(2). The procedure has engendered some controversy, and a division among the circuits, since it sometimes rewards unseemly gamesmanship. *See Tex. Brine Co. v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482, 485–87 (5th Cir. 2020) (reviewing the division of authority among courts of appeals addressing snap removal).

This case bears several hallmarks of such gamesmanship. Most notably, Removing Defendant's lawyer also represents three other defendants (two individuals, both named Margaret Lobkowicz, and one corporation, L.F.I., Inc.), all of whom are Massachusetts citizens.[3] *See* Docket No. 1, ¶¶ 16, 17, 21. Defense counsel represented at least two of those three defendants before this case was filed. *See* Docket No. 20-2, at 92 (stating, in a letter from

---

[3] To avoid ambiguity, I will generally refer to the various Lobkowicz defendants by their first names (and middle initials, where necessary).

defense counsel to Plaintiff's counsel, dated October 18, 2024, that defense counsel represents William, Margaret B., and L.F.I., Inc.). The Notice of Removal identified defense counsel as representing only the Removing Defendant, with the certificate of service attesting that Margaret B., Margaret S., and L.F.I., Inc. had been served by mail, as if they were unrepresented parties. *See* Docket No. 1, at 6–7. It seems, therefore, that defense counsel accepted service as to only Removing Defendant,[4] a non-Massachusetts defendant, in order to open the door to a snap removal.[5] *See* Docket No. 1-6, at 2.

   In similar circumstances, another judge of this Court has remarked that such conduct is "disingenuous" and "reminiscent of the gamesmanship that Congress sought to address when it enacted § 1441(b)(2)." *Rizzi*, 180 F. Supp. 3d at 69. Gamesmanship or not, the rules seem clear enough. As another judge of this Court has noted, "[i]f a plaintiff serves a non-forum defendant before serving a forum defendant, he has effectively chosen to waive an objection to the removal by a nimble non-forum defendant who thereafter removes the case before service upon a forum defendant named in the complaint." *Gentile v. Biogen Idec, Inc.*, 934 F. Supp. 2d 313, 322 (D. Mass. 2013).

---

[4] In his email accepting service for Removing Defendant, counsel sidestepped the question of whether he would accept service for his other clients, appearing to intentionally avoid naming Margaret B., Margaret S., or L.F.I., Inc. *See* Docket No. 1-6, at 2 ("We are being engaged by other defendants and are making inquiries regarding accepting service of process. . . . We are not authorized to accept for William Lobkowicz. We will get back to you regarding other defendants as we are able.").

[5] On November 11, 2024, twelve days after removal, defense counsel filed a notice of appearance on behalf of the other three defendants whom he represents. *See* Docket No. 10.

The problem here, however, is not with the procedural niceties of the forum defendant rule[6] or with the snap removal procedure. It is more fundamental: this Court lacks subject matter jurisdiction. The problem centers around an additional Lobkowicz defendant, William, who will be discussed at length in this decision.[7] William is a dual national of the United States and the Czech Republic, and he lives in the Czech Republic.

The removal statute provides a mechanism for removing a case to the federal forum, assuming there is jurisdiction in the federal court. But the statute does not provide a basis for jurisdiction. *See Fayard v. Ne. Vehicle Servs., LLC*, 533 F.3d 42, 45 (1st Cir. 2008) ("The removal statute, 28 U.S.C. § 1441, permits removal only where the district court could have exercised original jurisdiction over an action.").

Here, the removal was premised on the Removing Defendant's assertion that the case falls within the Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(3). *See* Docket No. 1, ¶ 12. Specifically, the removal notice recites that, "[u]pon information and belief, defendant William Lobkowicz is a dual United States and Czech citizen who resides in Prague, Czech Republic. Due to his Czech citizenship and his residency there, he is a subject of a foreign state." *Id.* ¶ 18 (citation omitted).

The assertion that William (as a dual citizen) is a "subject[] of a foreign state" for purposes of Section 1332(a)(3)—thus creating diversity jurisdiction—is a demonstrably incorrect

---

[6] Although the various courts of appeals differ as to the propriety of "snap" removals, there is no dispute that "the forum-defendant rule is a procedural rule and not a jurisdictional one." *Tex. Brine Co.*, 955 F.3d at 485.

[7] Counsel has not entered an appearance on behalf of William, and it appears that William has not yet been served in this case. It is not clear whether Defendant's counsel also represents William. *See* Docket No. 1-6, at 2 ("We are not authorized to accept [service] for William Lobkowicz.").

interpretation of the law. This would have been—and indeed was[8]—obvious to Defendant's counsel.

Simply put, U.S. citizens who are dual nationals are U.S. citizens; they do not count as foreign subjects for purposes of alienage jurisdiction. Moreover, if they do not reside within the United States, they are not considered citizens of any particular state and thus cannot invoke the federal courts' diversity jurisdiction. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989) ("In order to be a citizen of a State within the meaning of the diversity statute, a natural person must both be a citizen of the United States *and* be domiciled within the State.").

The jurisdictional issue was also obvious to the Court.[9] Upon reviewing the removal petition, I noted that, by virtue of his dual citizenship and overseas residence, William did not appear to be a "citizen" of any particular state, which defeats diversity jurisdiction. Accordingly, I issued an order to show cause, spelling out the evident jurisdictional defect and directing Defendant to address the issue. *See* Docket No. 9.

### B.    *Defendant's Response to the Order to Show Cause*

Defendant responded to the order to show cause by advancing a legal argument that rested upon a perilously thin—but nonetheless arguable—legal theory. This is the so-called "dominant nationality" theory, under which a dual citizen may claim that his U.S. citizenship is so attenuated that the court should disregard his U.S. citizenship and treat him as a foreign

---

[8] At oral argument, counsel acknowledged that he was aware of the issue. As discussed below, he apparently had in mind from the outset that he would raise the "dominant nationality" theory as a basis for claiming diversity jurisdiction.

[9] As the First Circuit has noted, the court has "an unflagging duty to ensure that it has jurisdiction over the subject matter of the cases it proposes to adjudicate [and, therefore, is] obliged to address the propriety of removal." *Am. Policyholders Ins. Co. v. Nyacol Prods., Inc.*, 989 F.2d 1256, 1258 (1st Cir. 1993) (considering whether removal was proper, despite parties' agreement that the federal courts had subject matter jurisdiction).

national, allowing him to invoke alienage jurisdiction. Under 28 U.S.C. § 1332(a)(3), the

alienage of a foreign citizen may provide a basis for federal subject matter jurisdiction, provided

that all other parties are citizens of different states or subjects of foreign states.

Counsel pointed to the Seventh Circuit's decision in *Sadat v. Mertes*, 615 F.2d 1176 (7th

Cir. 1980), which did not endorse the "dominant nationality" theory, but did suggest that the

theory might, under some circumstances, provide an exception to the rule that a dual citizen is a

U.S. citizen for diversity purposes. *See* Docket No. 13, at 4–5. The Seventh Circuit commented

on this point nearly thirty years after *Sadat*:

> *Sadat* discussed in *dicta* a hypothetical exception to this general rule in which a
> dual citizen whose "dominant nationality is that of a foreign country" might be
> considered a citizen of a foreign state under § 1332(a)(2). . . . However, *Sadat* did
> not endorse the "dominant nationality" test, but merely said that it would consider
> the possibility "arguendo."

*Buchel-Ruegsegger v. Buchel*, 576 F.3d 451, 454 n.2 (7th Cir. 2009) (citations omitted) (quoting

*Sadat*, 615 F.2d at 1187)).

To counsel's credit, he acknowledged that the courts of appeals in seven of the circuits

have held that, for U.S. citizens who also hold foreign citizenships, their U.S. citizenship controls

in determinations of diversity jurisdiction. *See* Docket No. 13, at 3 n.2. If anything, though, this

acknowledgement understates the weakness of counsel's attempted reliance on the "dominant

nationality" theory. It seems that *no* court anywhere has ever found subject matter jurisdiction

under Section 1332(a)(2) or (a)(3) based on the notion that a U.S. citizen could be treated as a

foreign subject under the posited theory.

In pressing the matter, Defendant's counsel noted that the First Circuit has not had

occasion to address the viability of the "dominant nationality" concept. *See id.* at 3. He further

noted that "the courts within the First Circuit that have confronted the question . . . have all

engaged in a dominant nationality analysis" and he argued that this "lends credence to the

ongoing viability of a dominant nationality exception." *Id.* at 5. In short, counsel asserted that the tendency of various courts to entertain the "dominant nationality" theory *arguendo* before finding that, regardless of the theory's validity, it would not apply to the given facts of a case, amounts to a tacit endorsement of the theory. As a matter of logic, this is mighty thin: dozens of judges saying "I don't know that unicorns exist, but *this* creature plainly has two horns" cannot reasonably be characterized as an indication that any judge believes in unicorns.

Although counsel's legal theory is tenuous, in the abstract it may have been arguable. What counsel elided in his submission, however, is that, while the *legal* underpinning of his removal was merely weak, the *factual* unpinning for any such "dominant nationality" claim was non-existent.

Defense counsel paraphrased from the Seventh Circuit's 1980 decision in *Sadat* in arguing that this Court could ignore William's U.S. citizenship upon a showing "(i) that his or her dominant nationality, by reason of residence or other association subject to his or her control, is that of the other state; and (ii) that he or she has manifested an intention to be a national of another state and has taken all reasonably practicable steps to avoid or terminate his or her status as a national of the respondent state." Docket No. 13, at 6 (citing *Sadat*, 615 F.2d at 1187).[10] Even if this were the applicable legal standard, however, the evidence directly contradicts any

---

[10] *Sadat* quotes this standard from the definition of an alien given "for purposes of the responsibility of a state for injury to an alien" that is set forth in the Restatement (Second) of the Foreign Relations Law of the United States. Restatement (Second) of the Foreign Relations Law of the United States § 171(c) (Am. L. Inst. 1965); *see Sadat*, 615 F.2d at 1187. *Sadat* considers nations' responsibilities for injuries to citizens of other nations in this context because, underlying its discussion of the potential for a "dominant nationality" test, is a posited interest in affording foreign litigants access to federal courts to "prevent[] international friction." 615 F.2d at 1187.

suggestion that William has "taken all reasonably practicable steps to avoid or terminate his . . . status as a national of" the United States.

In trumpeting William's claimed Czech nationality, Defendant's submission emphasizes that William "is, by heritage, Czech royalty." *Id.* at 5. The attached declaration states that William and his son "are still colloquially referred as [sic] Czech or Bohemian 'princes,'" although it does acknowledge that the Czech Republic "abolished noble titles in the 20th century." Docket No. 14, ¶ 3. Counsel further acknowledged at oral argument that the Czech Republic does not recognize hereditary aristocratic or royal titles. There is, accordingly, no vestige in this case of the kind of international comity issue that might otherwise be implicated in a lawsuit against foreign royalty. To put it bluntly, neither logic nor precedent support the notion that the meaning of 28 U.S.C. § 1332(a)(3) varies, depending on who your ancestors are.

In his response to the Order to Show Cause, counsel further asserted:

> Here, William has plainly shown that, by reason of residence or other association subject to his control, Czech is his dominant nationality. He has lived and worked in the Czech Republic continuously since 1991 (Lobkowicz Decl. ¶¶ 4-5); he has raised and educated his three children in the Czech Republic (*id.* ¶ 6); he has voluntarily obtained his Czech citizenship, which required him to, among other things, pass one of the most difficult citizenship examinations in the European Union, and swear an oath of loyalty to the Czech Republic, be integrated into Czech society, be a permanent and current resident of the Czech Republic, and prove fluency in the Czech language (*id.* ¶¶ 7-8, *id.* Ex. 4); he possesses and uses a Czech passport (*id.* ¶ 9; *id.* Ex. 5); he has paid taxes to the Czech government for decades (*id.* ¶ 10); and he votes in the Czech Republic (*id.* ¶ 11).

Docket No. 13, at 6.

What goes unmentioned in this protracted recitation are the critical facts that William was born in the United States, that he has lived most of his life in the United States, that he did not obtain Czech citizenship until December 14, 2023 (*i.e.*, less than 11 months prior to the notice of removal), that he has not renounced his U.S. citizenship, and that he has continued to travel on his U.S. passport in the past year. These critical facts, which demolish any imaginable claim that

the "dominant nationality" theory would apply here (assuming the theory has any legal validity in the first place), are buried in Defendant's filings; they can be gleaned only from William's declaration attached to Defendant's response to the Order to Show Cause. *See* Docket No. 14 ¶¶ 7, 9.

As for taking "all reasonably practicable steps to avoid or terminate his or her status as a national of the respondent state," Defendant has submitted no evidence to suggest that William has taken *any* steps whatsoever. For example, he has not surrendered his U.S. passport. On the contrary, even after obtaining Czech citizenship last year, he has continued to use his U.S. passport for travel. This is "disclosed" only obliquely, in William's assertion: "I possess and make use of a Czech passport, which was issued on January 11, 2024. Since then, I have used it *almost exclusively* for my international travel." *Id.* ¶ 9 (emphasis added). Rendered into plain English and addressed to the legally relevant issue, this averment would more accurately read: "I have continued to use my U.S. passport in the past year, even after obtaining my Czech passport last January."

Nor has William renounced his U.S. citizenship. He points to his Czech citizenship and states that he took an oath of loyalty to the Czech Republic. Based on his submission, it appears that—by contrast with the procedure for naturalization of U.S. citizens—William was not called upon to renounce or abjure any preexisting ties of citizenship or national loyalty. *See id.* ¶ 7.

In an effort to deflect the critical point—*viz.* that William has taken no steps to disavow his U.S. citizenship—he writes: "[t]o date, I have not renounced my U.S. citizenship in large part due to the expatriation tax, pursuant to which—as I understand it—I would owe a potentially bankrupting sum." *Id.* ¶ 12. Here too, a candid, plain-English rendering of William's submission

would read: "I have not taken any steps, let alone 'all reasonably practicable steps,' to 'avoid or terminate' my U.S. citizenship because I believe it would be very expensive to do so."

### C.    Remand Is Required Because this Court Lacks Jurisdiction

There are good reasons to be deeply skeptical about the viability of the "dominant nationality" theory. Although the concept has been advanced by counsel in numerous courts over the past 45 years, it appears that no court has ever accepted it. The Seventh Circuit's decision in *Sadat* is widely cited by parties seeking to invoke federal jurisdiction as reflecting a willingness to entertain the possibility that, in some circumstances, the theory might be viable. But, even within the Seventh Circuit, a subsequent panel of that court has noted that *Sadat* analyzed the theory only *arguendo* and that no circuit court since *Sadat* has adopted it. *See Buchel-Ruegsegger*, 576 F.3d at 454 n.2. That panel, however, declined to "decide the vitality of the possible *Sadat* exception." *Id.*

My skepticism about the viability of the "dominant nationality" theory is based primarily on the fact that it would add a judicial balancing test to congressionally enacted removal and diversity jurisdiction statutes that do not plainly give courts any such discretion. As the Supreme Court has cautioned, these statutes are subject to "strict construction" in order to avoid infringing the right of state courts to determine matters of state law. *See City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 76–77 (1941); *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941); *see also Danca v. Priv. Health Care Sys., Inc.*, 185 F.3d 1, 4 (1st Cir. 1999). Given that doubts concerning the court's jurisdiction are to be resolved against removal and in favor of remand to the state court (*see Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990)), it is difficult to see how the courts could adopt a judge-made doctrine under which subject matter jurisdiction would be based on an open-ended balancing test that attempts to weigh the various

incommensurable components of national identity so as to decide which is a dual citizen's "dominant" nationality.

However weak may be the theoretical underpinnings of the "dominant nationality" theory, this case provides no occasion to undertake a definitive analysis. Here, there is not even a colorable factual basis for invoking the "dominant nationality" theory, so there is no need to rule as to its hypothetical viability. That leaves us squarely amidst the parade of courts that have rejected "dominant nationality" claims based on the absence of any persuasive factual predicate. *See, e.g.*, *Ayenu v. Chevy Chase Bank, F.S.B.*, 496 F. Supp. 2d 607, 610–12 (D. Md. 2007); *Falken Indus., Ltd. v. Johansen*, 360 F. Supp. 2d 208, 210–11 (D. Mass. 2005); *Kery v. Am. Airlines, Inc.*, 962 F. Supp. 264, 265–66 (D.P.R. 1997); *Gefen ex rel. Gefen v. Upjohn Co.*, 893 F. Supp. 471, 473–74 (E.D. Pa. 1995); *Nazareth Candy Co. v. Sherwood Grp., Inc.*, 683 F. Supp. 539, 542 (M.D.N.C. 1988). To extend the metaphor—while I very much doubt that unicorns exist, this case is decidedly *not* a unicorn.

In rejecting Defendant's attempt to inveigle his way into federal court, I follow essentially the same reasoning adopted by Judge Lasker in this district, in *Falken Industries, Ltd. v. Johansen*, 360 F. Supp. at 210–11. In that case, as here, the ongoing use of a U.S. passport belied any suggestion that the dual national defendant in question had renounced his U.S. citizenship. *See id*. As Judge Lasker noted, "it is evident that Sautin continues to benefit from his Unite[d] States citizenship, as Defendants admit that Sautin maintains a current U.S. passport which he uses 'for the convenience of travel to the United States.'" *Id.* at 210. Those facts are essentially on all fours with the matter at bar, and the result must be the same.

Accordingly, I recommend that this case be remanded to the Massachusetts Superior Court.[11]

## II.    Recommendation Regarding Attorney's Fees and Sanctions

Unlike a motion to remand, a motion for attorney's fees is viewed as a dispositive motion, so a district judge must be the ultimate decision maker on that point. *See* Fed. R. Civ. P. 54(d)(2)(D) ("[T]he court . . . may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter."); *see also Adams v. Gissell*, No. 20-CV-11366, 2022 WL 2387881, at n.1 (D. Mass. Apr. 19, 2022) (explaining that a motion for attorney's fees is a dispositive motion), *report and recommendation adopted*, No. 20-CV-11366, 2022 WL 16702407 (D. Mass. Aug. 24, 2022). As no district judge has been drawn for this case, I will direct the Clerk of Court to assign the case to a district judge for purposes of considering this report and recommendation.

I note that district courts in the First Circuit have retained jurisdiction over motions for attorney's fees after the underlying cases were remanded to state court. *See, e.g.*, *WM Cap. Partners, 53 LLC v. San Juan Props., Inc.*, 270 F. Supp. 3d 545, 547 (D.P.R. 2017) (remanding case to state court and awarding, but not determining, costs and fees associated with removal), *appeal dismissed*, No. 17-2013, 2018 WL 11199003 (1st Cir. May 9, 2018) ("We lack

---

[11] Although the First Circuit has not addressed the question, *see Unauthorized Prac. of L. Comm. v. Gordon*, 979 F.2d 11, 13 (1st Cir. 1992), I generally follow other district and magistrate judges in this circuit and assume that a motion for remand is a non-dispositive motion for purposes of 28 U.S.C. § 636(b)(1) and Rule 72(a) of the Federal Rules of Civil Procedure. *See Delta Dental v. Blue Cross & Blue Shield*, 942 F. Supp. 740, 743–46 (D.R.I. 1996) (considering the question at length and holding that a motion to remand is non-dispositive); *see also Stefanik v. City of Holyoke*, 597 F. Supp. 2d 184, 185 (D. Mass. 2009) (collecting cases on the question).

In this instance, a Report and Recommendation is required for the fee award issue, so it makes sense to treat the entire matter as falling under Fed. R. Civ. P. 72(b).

jurisdiction to review the remand pursuant to 28 U.S.C. § 1447(d), and any appeal of the award

of sanctions, attorney's fees, and costs is premature, as the district court has not yet determined

the amount of fees and costs.").

### A.    Fee Shifting under Section 1447

    *1.    An Award of Attorney's Fees is Warranted, as Remand was a "Foregone Conclusion"*

Because there is considerable potential for wasteful gamesmanship in the removal of

cases to federal court, the removal statute includes a fee-shifting provision:

> If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.

28 U.S.C. § 1447(c).

So, what are "*just* costs and actual expenses"? Leaving aside, for the moment, the

computation of the *amounts* to be awarded, the first question is this: In what kinds of cases

should fee-shifting be ordered? On this point the Supreme Court has provided broad guidance,

which commences from the purpose behind the fee-shifting provision—namely, to deter the

kinds of delays and waste associated with removal shenanigans:

> The process of removing a case to federal court and then having it remanded back to state court delays resolution of the case, imposes additional costs on both parties, and wastes judicial resources. Assessing costs and fees on remand reduces the attractiveness of removal as a method for delaying litigation and imposing costs on the plaintiff.

*Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 140 (2005).

On the other hand, the Supreme Court has emphasized that Section 1447(c) is not

intended as an *in terrorem* measure that would deter removals in close or difficult cases. *See id.*

A balance is required:

The appropriate test for awarding fees under § 1447(c) should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied.

*Id.*

In light of these competing considerations, the Supreme Court has sketched out the factors that should guide the district court's discretion:

[T]he standard for awarding fees should turn on the reasonableness of the removal. Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied.

*Id.* at 141.

What, then, is "an objectively reasonable basis for seeking removal?" Neither the Supreme Court nor the First Circuit has spelled this out, but I find persuasive the reasoning of other judges in this district who have declined to award expenses and costs unless the facts are "so one-sided as to have made remand a foregone conclusion." *Huston v. FLS Language Ctrs.*, 18 F. Supp. 3d 17, 25 (D. Mass. 2014) (quoting *Youtsey v. Avibank Mfg., Inc.*, 734 F. Supp. 2d 230, 239 (D. Mass. 2010)); *see also Raymond C. Green, Inc. Tr. of Raymond C. Green Tr. v. Delpedio*, No. 23-CV-10732, 2023 WL 4347330, at *2 (D. Mass. July 5, 2023) (awarding attorney's fees under the "foregone conclusion" standard), *aff'd sub nom. Raymond C. Green, Inc., Tr. of Raymond C. Green Tr. v. Fiorillo*, No. 23-1583, 2023 WL 11872882 (1st Cir. July 18, 2023).

The "foregone conclusion" standard seems well suited to the task of identifying cases in which fee shifting under Section 1447(c) is required. It is amply protective of the rights of defendants who wish to pursue even close cases for removal, but it does not offer carte blanche for pointless gestures and needless time wasting.

In this case, remand was a "foregone conclusion" from the outset. It was obvious at the time of removal that there was no basis for claiming diversity jurisdiction. Applying the "foregone conclusion" standard might be a close call here if the only issue were a pure question of law. As discussed above, the legal rationale behind the "dominant nationality" theory on which Defendant rests his removal attempt is tenuous and it has been rejected by every court to consider it, including multiple courts of appeals. Moreover, courts within the First Circuit and, indeed, within this district have also rejected it. On the other hand, parties are entitled to some latitude to advance good faith arguments for novel interpretations of legal issues, even when there is a risk of delay.

In arguing against the imposition of sanctions,[12] Defendant asserts that "basing the Notice on the dominant nationality theory of jurisdiction was warranted by existing law: it is not foreclosed by any binding precedent in this Circuit and persuasive case law supports its viability." Docket No. 23, at 8. The first part of this assertion is true; the First Circuit has not ruled on the point. The second clause, however, is flatly wrong. There is no "persuasive case law that supports" the dominant nationality theory. On the contrary, it seems that no court has ever accepted an argument for subject matter jurisdiction based on the "dominant nationality" theory. The reference to "persuasive case law," if it is not altogether disingenuous, seems to be a hyperbolic characterization of the notion—of counsel's own concoction—that there is implied approval of the "dominant nationality" theory in the numerous court decisions that have assumed, *arguendo*, that the theory could be valid and have found that the factual predicate was absent. *See id.* at 9–10 ("Defendant cited **four** cases from within the First Circuit that—instead of

---

[12] As discussed below, both parties have devoted their briefing on the appropriateness of "sanctions" almost entirely to Rule 11, as opposed to Section 1447.

dismissing the theory wholesale—affirmatively analyzed whether the dual citizens in those cases had a foreign dominant nationality, thereby supporting that the theory was viable in the First Circuit." (citation and footnote omitted)). This is errant sophistry. As discussed above, no one is expressing an opinion about the existence of unicorns when they point out that the creature in front of them is a cow that is missing one horn.

But the tenuousness of the *legal* theory raised by Defendant is the least of it. For present purposes, I will assume that, with appropriate disclosure to the court, a defendant may properly raise an argument that has been rejected by every court to consider it, if it has not been foreclosed by binding precedent.

The critical problem here—and the reason sanctions are appropriate—is the absence of any *factual* foundation for Defendant's asserted grounds for removal. Regardless of whether there might, someday, be a set of circumstances that could warrant application of the "dominant nationality" theory, in this case it was a foregone conclusion that Defendant's invocation of that theory would fail.

If the "dominant nationality" theory has any legs at all, it would apply, not in routine cases of dual nationality, but only in exceptional circumstances—when a defendant's U.S. citizenship is so attenuated that the courts might be persuaded to ignore it altogether. There would need to be something extraordinary, reflecting a very high degree of attachment to the claimed foreign national identity and also a very high degree of dissociation from U.S. nationality. In this case, however, there is nothing to indicate that William has dissociated himself from his U.S. citizenship at all, let alone that he has done so to an extraordinary degree.

The complete absence of factual support for Defendant's position is particularly stark if we start from Defendant's own description of the legal theory on which he purports to rely. As

noted above, in Defendant's telling, the "dominant nationality" theory would require proof of two elements with respect to William: "(i) that his or her dominant nationality, by reason of residence or other association subject to his or her control, is that of the other state; and (ii) that he or she has manifested an intention to be a national of another state and has taken all reasonably practicable steps to avoid or terminate his or her status as a national of the respondent state." Docket No. 13, at 6 (citing *Sadat*, 615 F.2d at 1187). Yet, the second of these two essential elements is unmistakably absent. It is apparent that William taken *no* steps to avoid or terminate his status as a U.S. national.

It was obvious from the outset that there is nothing exceptional about William's circumstances. It seems that William has lived most of his life in the United States. To the extent that he reports living abroad since 1991, he has been solely a U.S. citizen for 32 of the 33 intervening years. Apparently, he continues to visit the United States since moving to the Czech Republic, and he does so using his U.S. passport (or, at least, he has done so within the past year). In short, we are dealing with an individual whose foreign citizenship has only recently been acquired and who has taken no affirmative steps to disavow his U.S. citizenship. At the risk of beating a metaphor to death: Defendant has suggested that a special rule for unicorns should apply in this case, but this particular cow still has both horns intact.

In arguing against sanctions, Defendant's counsel protests that he advanced an apparently novel argument based on "the history of alienage jurisdiction." Docket No. 23, at 10. This is Defendant's contention that diversity jurisdiction exists because William claims to be a lineal descendant of Bohemian royalty. In defense of his position, Defendant points out that there are no reported cases expressly addressing the validity of jurisdictional arguments based on a litigant's claimed aristocratic lineage. *Id.* at 10. But the mere absence of contrary case law is not

a touchstone of reasonableness. There are, presumably, an infinite number of irrelevant considerations that have not been addressed in case law. But this can hardly be taken to mean that counsel is free to waste the courts' time on such arguments, so long as there is no reported decision on the particular variation that counsel raises.

No amount of ornament and polish can disguise the obvious futility of Defendant's royal-ancestry argument in this case. The fatuousness of Defendant's contentions is particularly evident given that William plainly does not even satisfy the standard from *Sadat* that Defendant himself cited, and given that Defendant's counsel knew full well that there was a decision in this district which expressly ruled that continued use of a U.S. passport effectively foreclosed any assertion of the dominant nationality theory. *See Falken Indus., Ltd.*, 360 F. Supp. at 210. That is, counsel knew that a decisive factor that was addressed in a reported decision in this district was precisely on point with the facts of this case.

Undeterred, Defendant attempts to whistle past this ominous portent. Ratcheting up his contention that decisions which reject the "dominant nationality" theory can somehow be cited as *support* for the theory, Defendant asserts that "*Falken* is not negative precedent and instead supports the argument that the dominant nationality theory of jurisdiction is viable in this Circuit." Docket No. 23, at 9 n.7. This is nonsense.

From a broader perspective, the picture looks even worse. As noted above, some kinds of "snap" removal gamesmanship are legally permissible. But when subject matter jurisdiction is obviously lacking, we are no longer dealing with mere gamesmanship about forum selection; we are instead dealing with a frivolous attempt to invoke this Court's jurisdiction to cause delay.

Section 1446 requires that a notice of removal contain "a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). When, as in this case, removal is premised on a

dubious legal theory that has not been accepted by any court, the Court can reasonably expect that any such "short and plain statement of the grounds for removal" would mention this. As I commented at oral argument: "I find it very troubling that there was no identification in the submission to the Court to say we're here [and would] like to invoke your jurisdiction, but just so you know, we're invoking it under a theory that has never been accepted by any Court . . . . Instead, it sure feels like you tried sneaking in the side door." Docket No. 26, at 9:6–14.

In an analogous context, two sessions of this Court have ruled that it is incumbent upon a removing defendant to disclose that it is invoking the "fraudulent joinder" doctrine as a basis for removing a complaint that does not, on its face, reflect a dispute between diverse parties. *See DaSilva v. Germany*, 514 F. Supp. 3d 393, 396 (D. Mass. 2021) (ruling that failure to raise the fraudulent joinder theory in the notice of removal waived that theory as a basis for federal subject matter jurisdiction); *In re Pharm. Indus. Average Wholesale Price Litig.*, 431 F. Supp. 2d 109, 118 (D. Mass. 2006) ("[T]here is no question that the notice must make the basis for the federal court's exercise of removal jurisdiction clear and contain enough information so that the district judge can determine whether removal jurisdiction exists." (alteration in original) (quoting 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3733 (3d ed. 1998))). It may be an open question whether the same principle applies here, but it does Defendant little credit that his removal notice failed even to identify the legal theory on which he invoked this Court's subject matter jurisdiction.

I pressed Defendant's counsel at oral argument about why his notice of removal did not flag the unique (and dubious) basis for his invocation of diversity jurisdiction. The response was that counsel had simply assumed that the issue would emerge, in the fullness of time, and would be addressed in subsequent motion practice. *See* Docket No. 26, at 9:17–20. In other words,

Defendant was ready to waste this Court's time, and his opponent's resources, for as long as possible, and saw no need to point out the issue.

In short, this is a case in which remand was a foregone conclusion. Justice requires that Plaintiff be compensated for the reasonable legal fees incurred as a result of the baseless notice of removal.

    2.    *Plaintiff's Reasonable Attorney's Fees for Obtaining Remand*

As noted above, the Court flagged the jurisdictional defect in this case sua sponte and referenced the applicable law in its Order to Show Cause. Docket No. 9. From Plaintiff's perspective, getting this case remanded should not have been a heavy lift.

It was, nevertheless, reasonable for Plaintiff to weigh in on the remand issue, and Plaintiff submitted a well-written brief reviewing the state of the law, along with a declaration that added details about William's ongoing ties to the United States. *See* Docket Nos. 18, 18-1. Plaintiff pointed out the doublespeak in William's representation that he has used his Czech passport "almost exclusively" since he obtained it last January. *See* Docket No. 18, at 6 n.3. Plaintiff also alerted the Court that William is listed as a corporate officer for co-defendant L.F.I., Inc., and that the November 23, 2023, Annual Report for L.F.I. Inc. lists the same Dover, Massachusetts address for William (and all other officers) as for the corporation.[13] *See id.* at 6. Slightly more piquant is Plaintiff's submission of documentation which appears to show that in 2018 (roughly 27 years after the 1991 date that William claims as the onset of his residence in the Czech Republic), William purchased a cemetery plot in Dover, Massachusetts, in a burial

---

[13] I do not understand Plaintiff's references to the corporate addresses as challenging William's representations about his place of residence. Instead, I take Plaintiff to be pointing out William's ongoing availment of legal privileges in the United States as an indicator that he has not dissociated himself from the country of his birth and continued citizenship.

ground that is generally reserved for those who have lived in the town for at least five years. *See id.*

I have reviewed the billing record that Plaintiff has submitted, which reflects hours spent and topics addressed. *See* Docket No. 20-2, at 117–20. To arrive at an appropriate fee award under Section 1447, I have made adjustments to Plaintiff's submitted billings, which I explain below, and which are reflected in the chart attached to this order as Appendix A.

To focus on the work that was reasonably required to secure a remand of this matter, I have deleted items that are identified as relating to Rule 11. Whatever may be the merits of Plaintiff's Rule 11 motion, it cannot be said that pursuing that motion was reasonably necessary in addressing the question of subject matter jurisdiction in federal court.

Although Defendants challenge the reasonableness of the hourly rates listed by Plaintiff's counsel, I find that the rates listed are broadly consistent with those of highly credentialed and experienced "boutique" litigators in Boston, and I find that Plaintiff's counsel meet that description. *Cf. United States ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*, No. 09-CV-10179, 2024 WL 2720786, at *3 (D. Mass. May 28, 2024), *appeal dismissed*, No. 24-1612, 2024 WL 5278721 (1st Cir. Oct. 29, 2024).

In keeping with the First Circuit's guidance, I have also scrutinized instances where multiple attorneys worked on the same issue, as well as instances where attorneys billed for time spent conferring with one another, and I have removed billings that appear duplicative. *See Lipsett v. Blanco*, 975 F.2d 934, 938 (1st Cir. 1992) ("A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism.").

I recognize that "the mere fact that more than one lawyer toils on the same general task does not necessarily constitute excessive staffing." *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 297 (1st Cir. 2001). But the issue here was a discrete one; this is not an instance where multiple attorneys were needed to address separate aspects of a litigation. I have also considered that this particular issue was framed, in significant part, by the Court's sua sponte identification of the jurisdictional problem and by the issuance of an order to show cause. While it was reasonable for Plaintiff to weigh in—it is, after all, an adversary system—there was little chance that the Court would lose track of the issue it had ordered Defendant to address. Accordingly, I have removed various instances where the billing records appear to reflect piling-on in terms of the aggregate number of hours expended or in terms of the number of attorneys working on the matter.[14] As the First Circuit has noted, "[w]here tag teams of attorneys are involved, fee applications should be scrutinized with especial care." *Id.* at 298.

The principle I have applied here has been to allow fees that Plaintiff could and should reasonably have foreseen would ensue in response to Plaintiff's unfounded effort to remove the case to this Court. I have not, however, allowed fees that are attributable to the extra costs of double and triple layers of review, attendance by multiple lawyers at a hearing, and the like.

---

[14] In that vein, I have removed certain instances where a more senior lawyer billed for the time spent reviewing and editing a more junior lawyer's work. In doing so, I do not mean to suggest that this approach is necessarily improper; rather, it is common practice. *Cf. Thayer v. City of Worcester*, No. 13-CV-40057, 2017 WL 1190366, at *4 ("I would have expected much of the drafting and research to have been done by senior to lower level associates, whose work would then be reviewed and edited by more senior attorneys."). But here, the Court had already identified the jurisdictional issue, which was a discrete—albeit somewhat unusual—topic, and, in some instances, the cumulative amount of time spent on drafting, review, and editing appears excessive. Additionally, for a number of instances where multiple partners billed for participation in a meeting or correspondence, I have allowed the time billed by only one partner.

Such fees are not necessarily unreasonable when a willing client is paying—but they are not appropriate when an opponent is being required to foot the bill.

Section 1447(c) provides for an award of costs "incurred as a result of the removal." In this context, "result" must mean more than mere but-for causation; there must be an element of reasonable foreseeability. Thus, in multiple instances, I have excised hours that appear excessive, duplicative, or otherwise unnecessary. Given that this results in a substantial reduction in the total billings, I have not applied any further adjustments to the "lodestar" figure for Plaintiff's counsel's fees. While Plaintiff has proposed such a downward adjustment of ten percent, there is no need to apply a discount on top of the direct reductions of hours. *See* Docket No. 20-1, at 21.

As reflected in Appendix A, after my deductions, the remaining fees come to $24,895.00.

### 3.    *Plaintiff's Costs*

Plaintiff's motion also seeks costs in the amount of $3,999.87. *See id.* at 22. The bulk of this amount, $3,874.87, represents the cost of translating into Czech the material to be served upon William. *Id.* at 21–22. Plaintiff argues that this cost should be borne by Defendant because Defendant's counsel refused to accept service for William, leaving Plaintiff to effectuate service pursuant to the Hague Service Convention, thus apparently requiring a certified translation (even though William speaks English). *See id.* at 16, 21–22. There may be an element of gamesmanship in all this, but the translation cost incurred by Plaintiff to serve *William* cannot be said to relate directly to the motion for remand necessitated by the Removing Defendant's—*i.e.*, *Martin*'s—improper removal of this suit.

The remainder of the costs claimed represent the $125 spent in fees for the *pro hac vice* admission of Attorney Economides. *Id.* at 21. This expense, too, cannot be said to have been necessitated by Defendant's improper removal. It was Plaintiff's choice to retain an attorney not admitted in Massachusetts and, given that Plaintiff's other attorneys are admitted in the

Commonwealth, it was arguably unnecessary for Attorney Economides to enter an appearance at all.

In short, none of the costs claimed by Plaintiff appear to be "just costs . . . incurred as a result of the removal" and should therefore not be awarded under Section 1447. *See* 28 U.S.C. § 1447(c). What's more, I am already recommending that the Court award Plaintiff a substantial sum for fees; justice does not require an additional transfer of $3,999.87.

### B.    *Rule 11 Sanctions*

#### 1.    *Procedural Context*

I heard argument on the remand issue on December 5, 2024. At that time, I alerted Defendant's counsel that I was considering whether an order of costs under Section 1447 would be appropriate, and I provided the parties an opportunity to address the point. At the hearing, I invited Plaintiff's counsel to speak. While he (very reasonably) saw no need to address the merits of the jurisdictional issue, which had been fully briefed, he took the opportunity to ask to be permitted to brief the question of "sanctions." Docket No. 26, at 12:7. In so doing, Plaintiff's counsel did not explicitly mention Rule 11, but did in passing draw a distinction between "costs, which can include attorneys' fees" and "sanctions." *Id.* at 12:6–7. Counsel also referred to a 21-day notice period and asked for a more expedited briefing schedule. *See id.* at 12:5–9 ("[W]e ask . . . for the Court to move up our sanctions – the 21 days in the sanctions letter so we can file and retain jurisdiction over the sanctions motion . . . .").

In hindsight, I surmise that Plaintiff's counsel expected that I would recognize his reference to the 21-day notice period as a reference to *Rule 11* sanctions (as opposed to the fee-shifting provisions of Section 1447 that I had discussed with Defendant's counsel). But I missed that point. As the clerk's note for the hearing reflects, I understood that I was inviting submissions regarding fee shifting under Section 1447. *See* Docket No. 21 ("The Court also

invited the parties to address whether, if the Court issues an order of remand, the Court should also award fees and costs to Plaintiff under 28 U.S.C. § 1447."). Having not thought that Rule 11 sanctions were at issue, I did not caution Plaintiff against spending time on Rule 11 issues when relief was potentially available under Section 1447.

At the hearing, Plaintiff's counsel mentioned in passing that he had sent a "sanctions letter" to defense counsel, but the extent of the parties' communications regarding the prospect of sanctions was not explored at any depth. *See* Docket No. 26, at 10:15–17, 12:5–11. As I learned from Plaintiff's motion after the hearing, in response to Defendant's removal and his response to the Court's order to show cause, Plaintiff's counsel had alerted[15] defense counsel that Plaintiff intended to seek sanctions pursuant to Federal Rule of Civil Procedure 11 and had emailed defense counsel a draft sanctions motion on November 19, 2024. *See* Docket No. 20-2, at 10–11, 95.

In the wake of my invitation to the parties to address the fee shifting provisions of Section 1447—at least that is what I thought I was inviting—I received a veritable tsunami of filings devoted almost entirely to Rule 11. These include: Plaintiff's motion for sanctions pursuant to Rule 11 and supporting memorandum (Docket Nos. 20, 20-1), an opposition to that motion and cross motion to strike three excess pages from Plaintiff's memorandum (Docket No. 23), together with extended declarations (Docket Nos. 24, 25), a belated motion for leave to file the overlength brief (Docket No. 28), an opposition to that motion (Docket No. 29), a request for

---

[15] As discussed below, Defendant raises, in passing, a question as to whether the parties' *email* correspondence regarding a prospective Rule 11 motion satisfied the pre-filing service provisions of Federal Rule of Civil Procedure 11(c)(2). *See* Docket No. 23, at 5 n.5. Rule 11(c)(2) requires that a motion for sanctions must be *served* upon an opposing party 21 days before it may be filed with the court. *See* Fed. R. Civ. P. 11(c)(2).

leave to file a reply brief in support of sanctions (Docket No. 30), with a further declaration, and an opposition to that request (Docket No. 31).[16]

Given that the Court lacks jurisdiction over this case, that is a lot of litigation over a satellite issue. Having determined that the case does not belong here, I am loath to prolong its sojourn in federal court while sorting out the appropriate penalty for bringing it here in the first place.

### 2.    *Pre-Filing Requirements under Rule 11(c)(2)*

As a threshold matter, Defendant questions whether Plaintiff has satisfied the pre-filing service requirements for a Rule 11 motion, which are set forth in Federal Rule of Civil Procedure 11(c)(2). *See* Docket No. 23, at 5 n.5. Broadly speaking, compliance with Rule 11(c)(2) is precondition for any award of sanctions. *See Triantos v. Guaetta & Benson, LLC*, 91 F.4th 556, 565 (1st Cir. 2024). Rule 11(c)(2)'s so called "safe-harbor provision" requires that a motion for sanctions must be served upon an opposing party 21 days before it may be filed with the court, and requires that such a motion may not be filed if the offending filing is withdrawn or corrected within that period (or within a different period set by the court). Fed. R. Civ. P. 11(c)(2).

Here, there is no dispute that, on November 19, 2024, Plaintiff's counsel emailed Defendant's counsel a draft Rule 11 motion. A copy of that email and the appended draft motion is attached to the Rule 11 motion that was ultimately filed. *See* Docket No. 20-2, at 95–115. Defendant protests that these efforts were insufficient to satisfy the requirements of Rule 11(c)(2). *See* Docket No. 23, at 5 n.5. In particular, the draft sent by Plaintiff differs considerably from the final version (which was adapted to address the particular arguments that Defendant

---

[16] I have allowed the motions for these extra submissions and have reviewed them in connection with this Report and Recommendation.

advanced in response to my order to show cause). Defendant further protests that the draft motion was not served with the full formalities of Rule 5, but was instead sent by email.

There is some division of authority among the courts of appeals that have considered the degree of formality required to satisfy Rule 11(c)(2). *See Penn, LLC v. Prosper Bus. Dev. Corp.*, 773 F.3d 764, 768 (6th Cir. 2014) (reviewing approaches in different circuits). The First Circuit does not appear to have addressed the issue, although one judge within this district has repeatedly addressed the issue, applying a pragmatic standard. *Compare Anaqua, Inc. v. Schroeder*, No. 12-CV-10710, 2013 WL 1412190, at *1–2 (D. Mass. Apr. 5, 2013) (Saylor, J.) (permitting Rule 11 motion to proceed where there was no prejudice from failure to strictly comply with the technical requirements of Rule 11(c)(2) because letter explained grounds for sanctions in detail), *with Endobotics, LLC v. Design Standards Corp.*, No. 20-CV-10742, 2021 WL 3022136, at *1 (D. Mass. July 15, 2021) (Saylor, C.J.) (foreclosing Rule 11 motion where letter merely warned of possibility of sanctions).

I find that the draft motion sent by Plaintiff constituted adequate notice to comply with the safe-harbor provision of Rule 11. *Cf. Anaqua, Inc.*, 2013 WL 1412190, at *1–2 (allowing a Rule 11(c)(2) motion for sanctions to proceed, even though the motion was filed without first being sent to the opposing party, because the movant had sent a letter to the opposing party specifically invoking Rule 11(c)(2) and stating in detail the grounds and legal arguments for sanctions). Here, by sending a fully developed draft motion, Plaintiff provided ample notice that a motion was in the offing and informed Defendant, in considerable detail, of the motion's basis and arguments. This is a far cry from the sort of submission (typically a letter warning of an intention to seek sanctions) that has been deemed unsatisfactory by courts that apply a "strict" standard for compliance with Rule 11(c)(2). That the draft motion was expanded before filing to

address Defendant's actual submission to the Court seems immaterial; the gist of the motion and the arguments raised are largely unchanged.

As for Defendant's protestation that the draft motion was sent by email and should instead have been served in-hand by a process server or by other method allowed by Rule 5, I find that Plaintiff has substantially complied with the formalities of Rule 11(c)(2). In cases where parties have not yet appeared, formal service requirements make sense; they are necessary to document that a Rule 11(c)(2) draft motion was actually served on a party that may be held liable. But when, as here, the party to be served has removed a case to federal court, and has filed the notice of removal via the Court's CM/ECF system, email service is the norm. Email service is, if anything, more reliable (and faster) than service by hand. Defendant does not dispute that his counsel timely received the draft motion or that it was delivered by precisely the same mechanism (email) as the Court uses to ensure service of every other docket entry. I note that one court has ruled that sending a draft motion by email does not satisfy Rule 11(c)(2). *See Setliff v. Zoccam Techs., Inc.*, No. 21-CV-2025-B, 2022 WL 1092962, at *3–4 (N.D. Tex. Apr. 12, 2022). But much of the authority cited in that decision relates to cases where parties sent warning letters (as opposed to draft motions). While the formality of preparing and sending an actual draft motion may be required, I am not persuaded that email "service" is insufficient when a party has appeared and has provided an attorney email address via CM/ECF.[17]

In short, Plaintiff has substantially complied with Rule 11(c)(2).

---

[17] Under the CM/ECF Administrative Procedures of this Court, "[r]egistering to use CM/ECF constitutes consent to service of all documents by electronic means as provided in these procedures and Federal Rule of Civil Procedure (Fed.R.Civ.P.) 5(b) and 77(d), and Federal Rule of Criminal Procedure (Fed.R.Crim.P.) 49(b)." *See* CM/ECF Administrative Procedure E(6), https://www.mad.uscourts.gov/caseinfo/pdf/ECFadminProc.pdf.

3.     *The Fee Shifting Provisions of Section 1447(c) and the Sanctions Provisions of Rule 11 Overlap in this Case*

It is not obvious how the applicable legal standards of Section 1447(c) and Rule 11 differ. Neither party has briefed the issue. Indeed, the parties' respective briefs virtually ignore Section 1447(c), failing to even address the legal standard for ordering fees under that statute.

Plaintiff cites, in his reply brief (Docket No. 30-1, at 7), a Seventh Circuit decision which explicitly posits that Section 1447 and Rule 11 provide alternative, not additive, avenues for relief. *See Wisconsin v. Hotline Indus., Inc.*, 236 F.3d 363, 367 (7th Cir. 2000) ("The statutory change makes clear that § 1447(c) constitutes an alternative means to reimburse the victorious party without resorting to Rule 11."). Plaintiff, however, does not mention this portion of the Seventh Circuit's opinion.

In the circumstances of this case, I see little substantive difference between the "foregone conclusion" standard for awards of costs and attorney's fees under Section 1447(c) and the Rule 11 requirement that legal contentions be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2); *see* 28 U.S.C. § 1447(c).

While there may be similar legal standards for considering fee awards under Section 1447 and under Rule 11, those provisions serve significantly different purposes. And those differing purposes point to significant differences in application.

An important purpose of an award under Section 1447 is to fairly transfer to Defendant the costs and attorney's fees associated with a specific harm, namely needless delay and wasted attorney's fees associated with Defendant's removal of this case to federal court when remand was a "foregone conclusion." As the Seventh Circuit noted in *Hotline Industries*, "[i]mproper removal prolongs litigation (and jacks up fees). Under the American Rule parties bear their

expenses in one court system, 'but when their adversary wrongfully drags them into a second judicial system the loser must expect to cover the incremental costs.'" 236 F.3d at 367–68 (quoting *Garbie v. DaimlerChrysler Corp.*, 211 F.3d 407, 411 (7th Cir. 2000)). Plaintiff quotes this passage in his Reply Brief (Docket No. 30-1, at 7), although—as noted below—he seems to ignore its import as relevant to the difference between Section 1447 and Rule 11 sanctions awards. As detailed above, the reasonably foreseeable costs and attorney's fees for securing a remand (*i.e.*, "the incremental costs"), being the harm that Section 1447 seeks to remedy, amount to nearly $25,000.

Rule 11, by contrast, is a more general rule, aimed at deterring a broad range of frivolous submissions at virtually any stage of litigation. In keeping with this purpose, Rule 11 incorporates separate procedures, including the safe-harbor procedures of Rule 11(c)(2). As the First Circuit has noted, "Rule 11 should be used in appropriate cases to further its central purpose: deter baseless filings." *CQ Int'l Co. v. Rochem Int'l, Inc., USA*, 659 F.3d 53, 62 (1st Cir. 2011). A parsimony principle applies to Rule 11 sanctions: a sanction should be sufficient, but no greater than necessary, to accomplish the deterrent purpose of the Rule. *See* Fed. R. Civ. P. 11(c)(4) (providing that sanctions under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated").

In this light, I am hard pressed to see any advantage in litigating the same conduct from the vantage point of *both* Section 1447(c) and Rule 11. Plaintiff has, however, made his Rule 11 motion, and the Court is generally required to rule on such motions, although this arguably may be one of those "very rare instances where there may be good reasons not to decide" a Rule 11 question. *Figueroa-Ruiz v. Alegria*, 905 F.2d 545, 548 (1st Cir. 1990). Indeed, the First Circuit

has expressly noted the risk that ancillary litigation around Rule 11 issues could be disproportionate to the underlying controversy:

> [W]e must not lose sight of the fact that a related goal of Rule 11 is to "streamline the administration and procedure of the federal courts." *Cooter & Gell* [*v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)]. This tool and the sanctions it allows a district court to impose are intended to facilitate case management, not to increase caseload by requiring a district court to analyze the reasonableness of legal and factual contentions that it would otherwise not have to ascertain. We will not invite full-scale satellite litigation in the area of sanctions, nor will we require district courts to spend valuable judicial resources in punctiliously analyzing the reasonableness of each and every legal and factual contention made by a party where, as here, such analysis is not necessary to resolve the merits of the central claim in dispute.

*CQ Int'l Co.*, 659 F.3d at 62.

In any event, the Court has very broad authority under Rule 11 to fashion an appropriate remedy and to deny sanctions altogether. *See id.* at 59 ("[W]hile we afford a district court considerable latitude in reviewing its positive actions to impose sanctions, we accord 'extraordinary deference' when, as here, it has decided to deny sanctions.").

The First Circuit has offered some observations on the rough scale for setting Rule 11 sanctions and has struck down a sanctions award that lay "far outside the mainstream in this circuit, where sanctions typically amount to less than $10,000." *See Lamboy-Ortiz v. Ortiz-Vélez*, 630 F.3d 228, 249 (1st Cir. 2010). As noted above, the reasonably necessary fees that Plaintiff incurred in obtaining a remand add up to nearly $25,000—well over double the amount of "mainstream" sanctions in the First Circuit.

### 4.    No Incremental Sanction Is Required to Serve the Deterrent Purposes of Rule 11

Nearly $25,000 is a hefty sum of money to spend on securing a remand when the Court had sua sponte ordered Defendant to show cause. But, by invoking Rule 11 and briefing the issue exhaustively, Plaintiff has run up the bill to an extraordinary degree. The sum requested here,

$92,930.67 ($88,930.80 in fees plus $3,999.87 in costs), is astronomical.[18] *See* Docket No. 30-1, at 12. Having incurred roughly $25,000 in attorney's fees that were reasonably necessary to secure a remand in this case, Plaintiff seeks an aggregate award more than three times that sum, mostly for fees spent on litigating a Rule 11 motion that was wholly unnecessary, given that fee shifting is available under Section 1447(c). It speaks volumes that Plaintiff's request includes $15,615.00 in attorney's fees ($17,350 discounted by ten percent) attributable to the preparation and submission of a reply brief on sanctions, *see id.* at 8 n.3, a sum that is almost two thirds as much as the entire reasonable cost of briefing the underlying remand issue.

As the Supreme Court once noted of fee shifting in general, "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). In this case, by any plausible measuring stick (*e.g.*, number of filings, number of pages filed, or attorney's fees billed), the Rule 11 litigation dwarfs the litigation around the remand issue, even though Section 1447(c) already provided a fee-shifting mechanism that was explicitly compensatory in purpose and thus likely to produce a heftier award than a Rule 11 motion.

In asking the Court to award fees for the time Plaintiff spent pursuing Rule 11 sanctions, Plaintiff correctly notes that, in some instances, courts have included such amounts in fee awards under Rule 11. *See* Docket No. 30-1, at 8–9. The mere fact that such fee awards are sometimes appropriate, however, does not suggest that such an award is called for in this case. As discussed above, the compensatory purposes of Section 1447(c) already point to a fee award that exceeds

---

[18] Plaintiff's motion for sanctions stated fees of $81,462.00 and argued that a ten percent reduction is appropriate to account for duplicative work, thus arriving at a request for $73,315.80 in legal fees and $3,999.87 in costs. *See* Docket No. 20-1, at 21–22. In Plaintiff's reply brief in support of sanctions, Plaintiff added the fees charged for the drafting of that reply, $17,350.00, also reduced by ten percent, thus yielding a total request for $88,930.80 in fees and $3,999.87 in costs, together totaling $92,930.67. *See* Docket No. 31-1, at 8 n.3, 12.

the "mainstream" for Rule 11 awards, and there was there no need to litigate Rule 11 issues at all.

Plaintiff cites *Leavitt v. United Services Automobile Ass'n*, No. 23-CV-11341, 2024 WL 5076307, at *6 (D. Mass. Dec. 11, 2024), to support his assertion that courts may award fees that have been spent on litigating Rule 11 issues. *See* Docket No. 30-1, at 8–9. But the holding of that case cuts powerfully against Plaintiff's position. Recognizing that the deterrent purposes of Rule 11 do not require a wholesale transfer of expenses to the sanctioned party, the court in *Leavitt* explicitly noted that the Rule 11 sanction it had imposed was *less* than the amount of the attorney's fees that were reasonably expended in responding to the unjustified pleading. *Id.* (finding that the fees "reasonably incurred by the Defendants to be an amount greater than necessary to deter Plaintiff and his counsel's conduct"); *see Alston v. Town of Brookline*, No. 15-CV-13987, 2019 WL 117605, at *1 (D. Mass. Jan. 7, 2019) ("The purpose of the sanction is to deter similar misconduct in the future. It is not to make Spiegel whole for litigation expenses incurred. The failure of the ordered sanction to make him whole is therefore not a reason to disagree with the Magistrate Judge's analysis.").

As discussed above, Defendant's legal arguments for the "dual nationality" theory do not, in themselves, transgress the boundaries of zealous and creative advocacy. But Defendant's invocation of that theory on the facts of this case was not substantially justified. Accordingly, Defendant's notice of removal was filed in violation of Rule 11.

But the mere existence of a Rule 11 violation does not require the Court to impose sanctions. On the contrary, the Court's primary focus must be on "the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. As the First Circuit pointed out in *Obert v. Republic Western Insurance Co.*, even if a court "*could* sanction

counsel under Rule 11 for many such hopeless motions, . . . doing so routinely would tie courts and counsel in knots." 398 F.3d 138, 146 (1st Cir. 2005, revised Mar. 24, 2005).

The recommended award of approximately $25,000 in fees under Section 1447 is sufficient to deter future litigants generally, and Defendant specifically, from filing unsupportable removal notices. Indeed, the amount of reasonably foreseeable fees here exceeds by more than double the First Circuit "mainstream" Rule 11 sanctions amount of $10,000. Furthermore, the scale of the Rule 11 litigation in this case was wholly out of proportion with the needs of the case, particularly since there was already a statutory fee-shifting provision available. There is no need for any additional sanction under Rule 11, and certainly there is no need to encourage the filing of a Rule 11 motion when it is pure overkill.

Accordingly, I recommend that the Court impose no additional or incremental monetary award, beyond the amount to be awarded under Section 1447.

<u>CONCLUSION</u>

For the reasons set forth above:

I RECOMMEND that the Court order that this case be remanded to the Superior Court of the Commonwealth of Massachusetts;

I RECOMMEND that the Court order that Plaintiff be compensated $24,895, as an award of attorney's fees pursuant to 28 U.S.C. § 1447(c);

I RECOMMEND that the Court impose no additional monetary sanction pursuant to Federal Rule of Civil Procedure 11; and

I direct the Clerk of Court to draw this case to a district judge to consider my recommendations in this matter.


                                                    /s/ Paul G. Levenson
                                                    Paul G. Levenson
Dated: March 10, 2025                               U.S. MAGISTRATE JUDGE

<u>NOTICE OF OBJECTION PROCEDURE</u>

The parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the U.S. Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

APPENDIX A

| Line[19] | Date | Billing Entry | Professional | Rate | Time | Amount Allowed | Amount Deleted |
|---|---|---|---|---|---|---|---|
| 1 | 10/31/2024 | Assess strategic response to removal to federal court. | Economides | $ 800 | 0.6 | $ 480 | $ 0 |
| 2 | 10/31/2024 | Review and analyze notice of removal (.6); call and correspondence with Dynamis team re: same and case strategy (.6); review for filing notices of appearance and pro hac vice motion (.1). | Homer | $ 800 | 1.3 | $ 0 | $ 1,040 |
| 3 | 11/1/2024 | Assess motion to remand arguments and service/removal status. | Economides | $ 800 | 0.5 | $ 400 | $ 0 |
| 4 | 11/1/2024 | Assess motion to remand arguments and service/removal status. | Rosen | $ 900 | 1 | $ 0 | $ 900 |
| 5 | 11/1/2024 | Call with Dynamis team re: removal and remand issues (.5); legal research re: statelessness and dominant nationality doctrine (1.0) | Homer | $ 800 | 1.5 | $ 1,200 | $ 0 |
| 6 | 11/1/2024 | Confer with Dynamis team regarding motion to remand. | Stephens | $ 650 | 0.7 | $ 0 | $ 455 |
| 7 | 11/4/2024 | Call with C. Economides re: removal and remand issues (.4); review and edit draft of notice for state court re: ineffective removal including legal research re: same (1.7); correspond with Dynamis team re: same (.2). | Homer | $ 800 | 2.3 | $ 1,360 | $ 480 |
| 8 | 11/5/2024 | Assess notice of removal in state court and responsive strategy with remanding. | Economides | $ 800 | 1.4 | $ 1,120 | $ 0 |
| 9 | 11/5/2024 | Group call re: next steps as related to removal and federal court procedures | Rosen | $ 900 | 1 | $ 0 | $ 900 |
| 10 | 11/5/2024 | Prep and file NOA for C. Economides in federal court | Vigliarolo | $300 | 0.2 | $ 60 [20] | $ 0 |
| 11 | 11/5/2024 | Call and correspondence with Dynamis team re: removal and remand issues (.4); review Judge Levenson's order to show cause (.2); call and correspondence with Dynamis team re: same and next steps (.9). | Homer | $ 800 | 1.5 | $ 160 | $ 1,040 |
| 12 | 11/5/2024 | Confer with Dynamis LLP team regarding motion to remand and next steps. | Stephens | $ 650 | 0.7 | $ 0 | $ 455 |
| 13 | 11/5/2024 | Draft Rule 11 letter regarding notice of removal. | Stephens | $ 650 | 4.2 | $ 0 | $ 2,730 |

[19] Line numbers have been added by the Court for ease of reference.

[20] The table submitted by Plaintiff shows amounts billed by Ms. Vigliarolo that suggest her rate is $320 per hour, rather than $300 per hour (her rate as shown on Plaintiff's table). For example, on the table submitted by Plaintiff's counsel, this entry shows $64 as the amount billed; however, $300 x 0.2 = $60. Across Ms. Vigliarolo's three entries, these discrepancies add up to a total difference of only $22. I have adjusted the amounts downward to align with her stated rate, and that adjustment is reflected in this appendix.

| Line[19] | Date | Billing Entry | Professional | Rate | Time | Amount Allowed | Amount Deleted |
|---|---|---|---|---|---|---|---|
| 14 | 11/6/2024 | Calls and correspondence with Dynamis team re: removal and remand issues. | Homer | $ 800 | 0.7 | $ 0 | $ 560 |
| 15 | 11/6/2024 | Confer with Dynamis LLP team regarding motion to remand and next steps. | Stephens | $ 650 | 0.5 | $ 0 | $ 325 |
| 16 | 11/6/2024 | Research caselaw on alienage jurisdiction. | Stephens | $ 650 | 0.8 | $ 520 | $ 0 |
| 17 | 11/6/2024 | Draft Rule 11 letter regarding notice of removal. | Stephens | $ 650 | 1.1 | $ 0 | $ 715 |
| 18 | 11/8/2024 | Prepare for and participate in meet and confer regarding remand and federal jurisdiction. | Economides | $ 800 | 0.5 | $ 0 | $ 400 |
| 19 | 11/8/2024 | Meeting with opp counsel | Rosen | $ 900 | 0.7 | $ 630 | $ 0 |
| 20 | 11/8/2024 | Call with opposing counsel re: removal and remand; follow-up discussion with Dyanmis team re: same and strategy in response. | Homer | $ 800 | 0.5 | $ 0 | $ 400 |
| 21 | 11/8/2024 | Confer with Dynamis LLP team and opposing counsel regarding potential motion to remand. | Stephens | $ 650 | 0.2 | $ 0 | $ 130 |
| 22 | 11/8/2024 | Confer with Dynamis LLP team regarding potential motion to remand. | Stephens | $ 650 | 0.3 | $ 0 | $ 195 |
| 23 | 11/11/2024 | Revise Rule 11 letter. | Stephens | $ 650 | 0.5 | $ 0 | $ 325 |
| 24 | 11/12/2024 | Research Massachusetts procedure following remand from federal court. | Stephens | $ 650 | 1.2 | $ 0 | $ 780 |
| 25 | 11/13/2024 | Review of email correspondence; respond to opposing counsel; edits to sanctions letter | Rosen | $ 900 | 1.3 | $ 0 | $ 1,170 |
| 26 | 11/13/2024 | Edit Rule 11 sanctions letter re: frivolous removal attempt including legal research re: same; correspond with Dynamis team re: same. | Homer | $ 800 | 1.3 | $ 0 | $ 1,040 |
| 27 | 11/14/2024 | Draft motion for Rule 11 sanctions. | Stephens | $ 650 | 1.5 | $ 0 | $ 975 |
| 28 | 11/15/2024 | Draft motion for Rule 11 sanctions. | Stephens | $ 650 | 1.8 | $ 0 | $ 1,170 |
| 29 | 11/15/2024 | Research and obtain price quotes from translation services. | Stephens | $ 650 | 2.3 | $ 0 | $ 1,495 |
| 30 | 11/17/2024 | Draft motion for Rule 11 sanctions. | Stephens | $ 650 | 5.2 | $ 0 | $ 3,380 |
| 31 | 11/18/2024 | Edit Rule 11 sanctions motion; correspond with Dynamis team re: same. | Homer | $ 800 | 2.5 | $ 0 | $ 2,000 |
| 32 | 11/18/2024 | Draft motion for Rule 11 sanctions. | Stephens | $ 650 | 4.8 | $ 0 | $ 3,120 |
| 33 | 11/19/2024 | Administration Assess declaration and Rule 11 arguments. | Economides | $ 800 | 0.6 | $ 0 | $ 480 |
| 34 | 11/19/2024 | Final review of sanctions motion | Rosen | $ 900 | 0.2 | $ 0 | $ 180 |
| 35 | 11/19/2024 | Review defendants' response to order to show cause re: removal and remand (.2); correspond with Dynamis team re: analysis of same and next steps (.3); edit Rule 11 sanctions motion re: same (1.7); legal research re: same and potential waiver of service by William by submitting declaration (.6). | Homer | $ 800 | 2.8 | $ 640 | $ 1,600 |
| 36 | 11/19/2024 | Draft motion for Rule 11 sanctions. | Stephens | $ 650 | 3.8 | $ 0 | $ 2,470 |
| 37 | 11/20/2024 | Communications with client re: response to order to show cause. | Rosen | $ 900 | 0.2 | $ 180 | $ 0 |
| 38 | 11/20/2024 | Draft opposition to response to OSC. | Stephens | $ 650 | 3.2 | $ 2,080 | $ 0 |

| Line[19] | Date | Billing Entry | Professional | Rate | Time | Amount Allowed | Amount Deleted |
|---|---|---|---|---|---|---|---|
| 39 | 11/21/2024 | Draft opposition to response to OSC. | Stephens | $ 650 | 1.4 | $ 910 | $ 0 |
| 40 | 11/22/2024 | Correspond with Dyamis team re: order to show cause hearing and strategy re: same. | Homer | $ 800 | 0.3 | $ 0 | $ 240 |
| 41 | 11/22/2024 | Confer with client regarding documentation of facts regarding defendant's residency. | Douglas | $ 650 | 0.2 | $ 130 | $ 0 |
| 42 | 11/22/2024 | Draft opposition to response to OSC. | Douglas | $ 650 | 5.4 | $ 3,510 | $ 0 |
| 43 | 11/23/2024 | Draft opposition to response to OSC. | Douglas | $ 650 | 4.1 | $ 2,665 | $ 0 |
| 44 | 11/24/2024 | Review/edits to brief in opposition to response to show cause | Rosen | $ 900 | 1.5 | $ 0 | $ 1,350 |
| 45 | 11/24/2024 | Draft opposition to response to OSC. | Douglas | $ 650 | 2.7 | $ 1,755 | $ 0 |
| 46 | 11/25/2024 | Edit opposition to remand. | Economides | $ 800 | 0.8 | $ 640 | $ 0 |
| 47 | 11/25/2024 | Final review/edits to motion | Rosen | $ 900 | 1.3 | $ 0 | $ 1,170 |
| 48 | 11/25/2024 | Edit opposition to defendant's order to show cause re: removal and declaration in support of same (1.5); correspond with Dynamis team re: same (.2). | Homer | $ 800 | 1.7 | $ 0 | $ 1,360 |
| 49 | 11/25/2024 | Revise and finalize filing papers for opposition to response to OSC. | Douglas | $ 650 | 3.7 | $ 2,405 | $ 0 |
| 50 | 11/26/2024 | File, print and mail out Opp to Response to OSC | Vigliarolo | $300 | 0.5 | $ 150 | $ 0 |
| 51 | 11/27/2024 | Review of case law and other materials (underlying documents) in preparation for Thursday's oral argument | Rosen | $ 900 | 0.5 | $ 450 | $ 0 |
| 52 | 12/2/2024 | Review of case law and other materials (underlying documents) in preparation for Thursday's oral argument | Rosen | $ 900 | 1.6 | $ 1,440 | $ 0 |
| 53 | 12/2/2024 | Search/Download all cases cited in both responses to show cause order | Vigliarolo | $300 | 0.4 | $ 120 | $ 0 |
| 54 | 12/3/2024 | Calls and correspondence with E. Rosen and D. Stephens re: prep for removal hearing. | Homer | $ 800 | 0.6 | $ 0 | $ 480 |
| 55 | 12/3/2024 | Draft outline for oral argument concerning remand and Rule 11 motion. | Stephens | $ 650 | 5.3 | $ 0 | $ 3,445 |
| 56 | 12/4/2024 | Review of case and outline regarding motion to remand (prep for oral argument) | Rosen | $ 900 | 2.4 | $ 0 | $ 2,160 |
| 57 | 12/5/2024 | Assist E. Rosen in preparing for remand hearing and discuss follow-up strategy for sanctions and service of process. | Economides | $ 800 | 1.1 | $ 0 | $ 880 |
| 58 | 12/5/2024 | Edits/revisions to sanctions motion | Rosen | $ 900 | 1.2 | $ 0 | $ 1,080 |
| 59 | 12/5/2024 | Prep and revision of outline for oral argument in court related to motion to remand (show cause motion) | Rosen | $ 900 | 1.3 | $ 1,170 | $ 0 |
| 60 | 12/5/2024 | Oral argument prep with C. Economides (.3); attendance and participation in oral argument | Rosen | $ 900 | 0.8 | $ 720 | $ 0 |
| 61 | 12/5/2024 | Removal hearing; correspond with client and Dynamis team re: same and remand issues. | Homer | $ 800 | 0.6 | $ 0 | $ 480 |
| 62 | 12/5/2024 | Prepare for and attend hearing on removal. | Stephens | $ 650 | 1.8 | $ 0 | $ 1,170 |

| Line[19] | Date | Billing Entry | Professional | Rate | Time | Amount Allowed | Amount Deleted |
|---|---|---|---|---|---|---|---|
| 63 | 12/5/2024 | Revise motion for sanctions under Rule 11. | Stephens | $ 650 | 5.1 | $ 0 | $ 3,315 |
| 64 | 12/6/2024 | Revise motion for sanctions under Rule 11. | Stephens | $ 650 | 1.2 | $ 0 | $ 780 |
| 65 | 12/6/2024 | Prepare filing papers and exhibits for motion for sanctions under Rule 11. | Stephens | $ 650 | 1.2 | $ 0 | $ 780 |
| 66 | 12/6/2024 | Continued edits to draft brief prepared by D. Stephens | Rosen | $ 900 | 1.4 | $ 0 | $ 1,260 |
| 67 | 12/7/2024 | Continued edits to draft brief prepared by D. Stephens | Rosen | $ 900 | 2.2 | $ 0 | $ 1,980 |
| 68 | 12/7/2024 | Revise memorandum and prepare filing papers and exhibits for motion for sanctions under Rule 11. | Stephens | $ 650 | 2.8 | $ 0 | $ 1,820 |
| 69 | 12/8/2024 | Revise memorandum and prepare filing papers and exhibits for motion for sanctions under Rule 11. | Stephens | $ 650 | 0.8 | $ 0 | $ 520 |
| 70 | 12/8/2024 | Finalize and file motion for sanctions under Rule 11. | Stephens | $ 650 | 2.1 | $ 0 | $ 1,365 |
| | | | | | **Total Amount Allowed:** | **$ 24,895** | |